# SNYDER & BLANKFARD CO., INC. *v.* FARMERS' BANK OF TIFTON

[No. 4, October Term, 1940.]

602

604

*Decided December 17th, 1940.*

The cause was argued before BOND, C. J., PARKE, SLOAN, MITCHELL, JOHNSON, and DELAPLAINE, JJ.

*Henry L. D. Stanford, Jr.,* and *Richard C. Cole,* with whom was *Joshua W. Miles* on the brief, for the appellant.

*J. Kemp Bartlett, Jr.,* with whom were *Robert D. Bartlett* and *Bartlett, Poe & Claggett* on the brief, for the appellee.

PARKE, J., delivered the opinion of the Court.

The Farmers Bank of Tifton, a corporation of the State of Georgia, brought an action in the Superior Court of Baltimore City against The Snyder & Blankfard Co., Inc., a corporation of the State of Maryland, which was carrying on in Baltimore City a wholesale fruit and vegetable commission business. A recovery was sought for damages alleged to have been sustained by the plaintiff because of the defendant's refusal to pay fourteen drafts of the sum of $4050. A demurrer was sustained to the original declaration. The amended declaration is in one count and the demurrer to it was overruled, and this action of the court gives rise to the first question on appeal.

The declaration, after stating the names and status of the plaintiff and defendant, and the business of each, sets out the facts on which it relies. The substance of these allegations is to this effect. A certain H. J. Cox and H. J. Cox, Jr., trading under the name of H. J. Cox & Son, were a wholesale shipper of fruit and vegetables. On June 1st, 1938, this firm began the shipment of fruit and vegetables to the defendant and closed its shipments on June 10th, 1938. The shippers drew on the defendant for every shipment in an amount which corresponded with the estimated net value of the shipment to the shipper. The drafts were discounted by the plaintiff as the several shipments went forward. Between June 2nd and June 7th, the plaintiff discounted eight such drafts, which aggregated $2250. Two of these drafts were for $250 each, and were drawn on June 2nd and paid by the defendant on June 8th. The second two drafts were for $200 and $400, and were dated on June 4th, and and similarly paid on June 8th. The third two drafts were for $300 each, and were dated on June 7th, and duly paid on June 10th. The fourth set of two drafts, in the total sum of $550, were dated June 7th, and were paid on June 13th.

These allegations of the declaration are the introduction of the further allegations that, in response to in-

quiries made on June 10th by the plaintiff of the defendant, a telegram was received by the plaintiff from the defendant of the following tenor:

"1938 Jun 10 AM 1158

"Baltimore, Md. 10 1148A

"Farmers Bank of Tifton, Georgia

"We have paid all drafts on us by H. J. Cox and Son and will honor their future drafts as in the past.

"Snyder & Blankfard Co."

The pleader follows the insertion of this telegram with these averments:

"Thereupon the plaintiff on the strength and credit of said telegram, and relying upon the promise and guarantee of the defendant, as expressed therein, and while the same remained in full force and effect, unrevoked or withdrawn, discounted for and paid to H. J. Cox & Son the following drafts, all drawn by said H. J. Cox & Son on the defendant, The Snyder & Blankfard Co., Inc., all of said drafts covering fruit and vegetables shipped by H. J. Cox & Son to the defendant, namely:

"Draft dated June 6, 1938, to the order of H. J. Cox & Son, amount, $350.00, and endorsed and negotiated by the payees."

The pleader then follows with the recital of thirteen similar items, *mutatis mutandis,* with dates and amounts of these drafts, and the averment that the drafts on the defendant were promptly and in due course presented for payment to the defendant, but that the defendant failed to live up to its promises and guaranty, and did not pay the listed fourteen drafts. It is for this asserted breach that the action was begun.

After the demurrer was overruled, the defendant pleaded the general issue, and in specific denial that the telegram embodied in the declaration was sent by an authorized agent of the defendant. After appropriate pleading the parties were at issue and a trial had, which culminated in a judgment for the principal sum of the unpaid drafts. In addition to the questions raised by the

demurrer, there are exceptions reserved to the rulings on the testimony and on the prayers.

The declaration alleges that the plaintiff discounted for the consignor all of these fourteen drafts because of its reliance on the assurance given by the telegram which is reproduced in the declaration. Since the respective times of the discount of the dishonored drafts is not given by the declaration, and the language of the pleader is positive that every one of the drafts was discounted because of the plaintiff's receipt of the telegram, and its inducement to the discount of all the drafts, the declaration is in wording sufficiently definite in this respect. What the testimony on this point may be is another question, which is not to be anticipated in the decision on the demurrer.

There is, however, another ground for the demurrer. While the acceptance of a bill must be in writing and signed by the drawer, it may be written on a paper other than the bill. If so, it does not bind the acceptor, except in favor of the person to whom it is shown, and who, on the faith thereof, receives the bill for value. Again, an unconditional promise to accept a bill before it is drawn is deemed an actual acceptance in favor of every person who, upon the faith thereof, receives the bill for value. Code 1939, art. 13, secs. 151, 153, 154. The exaction that the acceptance or the promise to accept must be in writing is gratified by a telegram to that effect over the name of the party to be bound. *Infra*, and 5 *Uniform Laws Annotated, Negotiable Instruments*, secs. 134, 135, pp. 804, 805; *Trevisol v. Fresno Fruit Growers Co.*, 195 Iowa 1377, 192 N. W. 517; *Commercial Bank v. Morgan City First Nat. Bank*, 147 La. 925, 86 So. 342; *Wallace State Bank v. Corn Exchange Bank*, 220 Mo. App. 1062, 282 S. W. 86; *Selma Sav. Bank v. Webster County Bank*, 182 Ky. 604, 206 S. W. 870; *Farmers' Bank of Morrill v. Stapleton*, 118 Kan. 755, 236 P. 828; *James River Nat. Bank v. Thuet*, 135 Minn. 30, 159 N. W. 1093; *Bulliet v. Allegheny Trust Co.*, 284 Pa. 561, 131 A. 471.

By the Negotiable Instruments Act an acceptance is either general or qualified. Thus a general acceptance assents without qualification to the order of the drawer. A qualified acceptance varies in express terms the effect of the bill as drawn. One of the forms of a qualified acceptance is a conditional acceptance, which occurs where the payment by the acceptor is made dependent upon the fulfilment of a condition stated in the acceptance. Code 1939, art. 13, secs. 158-160. Similarly a promise to accept a bill to be drawn is either general or qualified, accordingly as the promised acceptance is to be either general or qualified. *Lewis v. Kramer & Rahn,* 3 Md. 265, 289; *Franklin Bank v. Lynch,* 52 Md. 270, 278, 279; *Flora First National Bank v. Clark,* 61 Md. 400; *Citizens, Bank v. Henry J. Perkins Co.,* 250 Mass. 156, 145 N. E. 280; *Central Savings Bank v. Richards,* 109 Mass. 413; *Sigel-Campion Live Stock Commission Co. v. Davis,* 69 Colo. 511, 194 P. 468; *Iowa State Sav. Bank v. City Nat. Bank of Tipton,* 183 Iowa 1347, 168 N. W. 148; *Oil Well Supply Co. v. MacMurphey,* 119 Minn. 500, 138 N. W. 784; *Hall v. Emporia First Nat. Bank,* 133 Ill. 234, 24 N. E. 546, affirming 35 Ill. App. 116; *Ulster County Bank v. McFarlan,* 5 Hill, (N. Y.) 432, 434, affirmed 3 Denio, (N. Y.) 553; *Coolidge v. Payson,* 2 Wheat. 66, 75, 4 L. Ed. 185.

In *Franklin Bank v. Lynch,* 52 Md. 270, the court had under consideration the sufficiency of a Saturday dated telegram, "You may draw on me for seven hundred dollars," to constitute an acceptance of a bill of exchange drawn on the following Monday on the sender of the telegram by its recipients for the sum of $700 and made payable at sight to their own order. The bill of exchange, with the telegram, was presented to a bank, which, after the endorsement by the makers, and on the faith of the authority given by the telegram, gave the drawers credit for the amount of the draft and duly forwarded it for collection, but the drawee refused to pay the draft and it was protested for nonpayment. In an action brought by the bank against the drawee, it was held that re-

covery could not be had against the drawee on the draft as "the telegram does not point to or designate the draft; only the amount for which" the drawers "were authorized to draw is mentioned, but in all other respects the telegram is silent, not specifying on what time the draft is to be drawn." 52 Md. page 279. The court likewise held there could not be a recovery on the general money counts.

On the other hand, the court, while critical of its technical form, held that the first count of the declaration was in case and that the plaintiff could recover on the theory that an obligation to pay arose from the authority conferred by the telegram upon the maker of the draft to negotiate it, within a reasonable time, and with an implied promise from the sending of the telegram to accept and pay the draft to the payee and to the person who, in reliance upon the implied promise to pay embodied in the seen telegram, took the paper for value and in good faith.

In the later decision of *Flora First National Bank v. Clark,* 61 Md. 400, the earlier ruling in *Franklin Bank v. Lynch, supra,* that the drawee in that case was not bound as an acceptor under the doctrine of an implied acceptance was, with reason, criticized, but followed on the other theory that a recovery is permitted on the promise to accept. As stated in the second case, "It is a liability therefore founded on agreement constituting a valid contract between the promisor and promisee, inuring to the benefit of a third party who has been induced to advance money on the faith of the agreement." 61 Md. page 407. *Brown, Graves & Co. v. Ambler,* 66 Md. 391, 398, 7 A. 903, and *supra.*

The pleader in the instant appeal did not declare against the defendant on the drafts as an acceptor, but in case on its liability in damages for its breach of a promise to accept. The promise alleged is that the defendant "will honor their (sic) future drafts as in the past." The promise is clearly not absolute but qualified. It does not bind to accept and pay drafts when and as

made, with or without funds. On the contrary, it imposes a limitation. Thus the drafts within the promise are those which are subsequent to the date of the telegram. Again, in respect of such drafts the promise is not to honor, that is, accept and pay, them unqualifiedly, but to accept and pay them "as in the past." So there is created the condition that these drafts are not bound to be accepted and paid except it be as prescribed. The effect to be accorded this phrase depends upon the meaning of "as" in this context. It is an adverbial use of the word with the significance of in that degree, to that extent, so far, in like manner. The meaning of the phrase is referable to the past similar transactions of the drawer, the holder and the drawee. It is to say that as the manner, course and degree of the acceptance and payment of prior drafts has customarily been in the past, so shall the promisor accept and pay future like drafts. Subject to this qualification, the drawee promised to honor the drafts, and further than this it was not engaged. The phrase therefore incorporated in the agreement a qualification whose meaning was to be sought and found in the former dealing of the parties in similar transactions. This is a permissible qualification and made a condition of the acceptance and payment of every future draft. Unless the condition be presently fulfilled, the promisor is not bound to accept and to pay, and until then there is no breach by it of its contract, and, so, no liability in damages. It follows that the promisee can have no demand, as there can be no breach, until the condition prescribed by the contract is performed or waived. Hence, the general rule in such cases is that the condition should be shown by the plaintiff in the declaration, and its performance averred. 1 *Poe, Pl. & Pr.*, sec. 565; *Gill & McMahon v. Weller,* 52 Md. 8, 9, 14; *International Finance Corp. v. Calvert Drug Co.,* 144 Md. 303, 314-316, 323, 124 A. 891; *Crane Co. v. Druid Realty Corp.,* 137 Md. 324, 330, 112 A. 621; 10 *C. J. S., Bills and Notes,* sec. 572, p. 1192, sec. 588, p. 1214; *Moore v. United States,* 196 U. S. 157, 166, 25 S. Ct. 202, 49 L. Ed. 428;

*Harris v. Vandeveer's* Excr., 21 N. J. Eq. 424, 428; *Monsen v. Macfarland & Co.,* [1895] L. R. Q. B. D. 562.

The declaration at bar ignores the conditional nature of the defendant's promise and treats it as an absolute contract to accept and pay to the holder the drafts here involved. Accordingly, the averments do not set forth the condition of the defendant's promise to honor the drafts, nor does the declaration aver its performance. The pleader has not appropriately shown the former condition for the acceptance and payment of prior similar drafts by the defendant. It is merely stated that they were paid and that the later drafts sued on were duly presented for payment to the defendant which "failed to live up to its promise and guarantee and did not pay said drafts." Thus the pleader neglects to show the customary mode and course involved in the acceptance and payment by the defendant of earlier drafts and their performance with reference to the drafts in action. Neither does he aver that the custom was for the defendant to honor like drafts in the past by their acceptance and payment merely on presentation.

In the absence of these or similar alternative allegations and of any averment, in the words of the promise of the telegram, that the plaintiff presented the drafts for acceptance and payment as in the past, and the defendant did not so honor them, the declaration fails to state a breach of contract by the defendant. For the reasons given, the demurrer should have been sustained. 1 *Poe, Pl. & Pr.,* sec. 565; *Brown, Graves & Co. v. Ambler,* 66 Md. 391, 396, 397, 7 A. 903; *Gill & McMahon v. Weller,* 52 Md. 8, 9; 14 *Am. & Eng. Encyc. of Pl. & Pr.,* p. 529 (9); *Ralli v. Sarell,* D. & R. p. 33, n., 171 Eng. Reprint, 908; *Byles on Bills,* \*194.

As this conclusion with reference to the ruling on the demurrer will require a reversal and remand, the remaining questions on the bills of exception will be considered. A summary of the testimony is necessary for this purpose. In the first place, the intention of the parties to the contract as expressed in the telegram

which has been quoted excludes from consideration some of the drafts. It is clear that the telegram is limited in its application to the drafts drawn after the time of its delivery to the plaintiff. No act of the plaintiff may be said to have been done in reliance upon the promise set forth in the telegram until its terms were made known to the plaintiff, which was upon its delivery at mid-day of June 10th, 1938. It is further clear that the telegram asserts that all drafts drawn on the defendant by the shipper had been paid, and that the defendant follows this statement with the promise that it "will honor their (its) future drafts as in the past." In order to ascertain the undertaking of the defendant in thus promising qualifiedly to honor the future drafts of the shipper, it becomes imperative to learn what were the circumstances attendant upon the acceptance and payments by the defendant of the former drafts, since these are intended to be the conditions upon which future drafts were to be accepted and paid. The statement of the telegram that all former drafts had been paid leaves open to inquiry what were the requisites of such acceptance and payment, since the intention is expressed that these requisites must exist for future drafts to be honored, and since the mere fact of payment does not exclude the pre-existence of conditions to such payment. So, the particular course of dealing of the commission merchant in regard to the acceptance and payment of former drafts is an important consideration in the construction of what the defendant promised. *Booth v. Irving Nat. Exchange Bank,* 116 Md. 668, 672, 673, 82 A. 652; *Penrose v. Page,* 145 Md. 14, 20 125 A. 553; *First National Bank of Baltimore v. Gerke,* 68 Md. 449, 456, 13 A. 358; 3 *Williston on Contracts,* (Rev. Ed.) sec. 629; *Phoenix Pad. Mfg. Co. v. Roth,* 127 Md. 540, 544, 96 A. 762; *Abuc Trading etc. Corp. v. Jennings,* 151 Md. 392, 405-408, 135 A. 166; *Brownstein v. N. Y. Life Ins. Co.,* 158 Md. 51, 56-58, 148 A. 273; *Henry v. Jones,* 65 Cal. App. 323, 224 P. 104, In its fundamental nature, the telegram was an offer of a promise on a condition whose terms were to be fixed

by the past usage of the offeror in reference to the acceptance and payment of former drafts of the shipper. The offer of this promise became a contract, subject to the prescribed condition, when the holder bought a draft in acceptance of the offer. So what the customary course of the dealings of the drawee was in reference to the subject matter became a term of the contract to be established and found from the proof. The written contract without the qualification "as in the past" would not be the same contract as it is with the qualification. The contrast points the vital difference.

The defendant is a corporation engaged in the commission business in Baltimore City. It procures for the reward of a commission wholesale purchases for fruit and vegetables delivered to it for sale by its patrons. The partnership of H. J. Cox and H. J. Cox, Jr., trading as H. J. Cox & Son, was a shipper of these products by wholesale, and its place of business is in the State of Georgia. The firm shipped by motor truck, and began on June 1st, 1938, to forward its fruit and vegetables to the defendant for sale on commission. As every truck load went forward the shipper would estimate the probable net return in money of the sale of the truck load for its benefit and prepare a draft on the commission agent for the estimated return, and transfer the draft to the plaintiff bank for the face value of the draft and deposit the amount with the bank to the credit of the shipper. The bank would then forward the draft to its correspondent in Baltimore to present the draft for acceptance and payment by the commission house. In the declaration the drafts are stated to have been "discounted" by the bank, and consequently this word has been used in this opinion in the consideration of the demurrer. The testimony is that the drafts were not discounted but bought. The difference is not important. See *Lazear v. Nat. Union Bank*, 52 Md. 78, 128; *Black v. Bank of Westminster*, 96 Md. 399, 428, 54 A. 88.

Beginning with June 2nd, 1938, eight similar, separate, drafts, in the aggregate amount of $2250, were issued,

614

in the manner described, on June 2nd, 4th, and 7th, and were paid respectively on June 8th, 10th, and 13th. The money thus severally obtained by the shipper of the bank was a separate advance by the bank on every truck load which went forward. As the loads were received and sold, the defendant accepted and paid the drafts. This method of dealing was continued until the morning of June 10th, when the shipper offered more than the usual amount in drafts to the bank, which asked for further assurance that the drafts would be paid in order that the bank would continue to buy them. The vice-president of the bank was then told by the shippers that they would have the drawee wire that the drafts would be paid. About noon of June 10th, the telegram set out in this opinion was sent and received. The testimony on the part of the plaintiff tends further to show that, in reliance upon this telegram the bank bought four such drafts on June 10th, and five others on June 11th. The total of the principal amount of these nine drafts is $2600. All of these drafts, together with five other drafts, in the amount of $1450, which were issued and discounted before June 10th, were dishonored and remain unpaid. No draft after June 11th is involved in this litigation.

On this testimony of the plaintiff it appears that, before June 10th, the bank acquired every one of the drafts on the basis that they were each severally drawn with reference to a separate shipment by a motor truck to the drawee, and that the bank relied upon the assurance of the shipper that the shipment which the draft covered had actually been made before the bank acquired title to the draft. The bank, also, was aware that the drafts for these loads were honored irregularly in time, as the lapse between the day the bank obtained title and the date of the payment of the draft varied from three to six days. The testimony offered by the plaintiff does not affirmatively show the bank to have had knowledge of any further details of the course of the dealings between the shipper and the commission merchant with regard

to the drafts before June 10th. It was on this date that the bank sought and received the measure of the merchant's undertaking. The qualification imposed by the telegram was the condition that future drafts would only be honored "as in the past." The terms of the telegram put the bank on inquiry, and, so, on notice of what had been the course of the dealings in the past of the parties with reference to the acceptance and payments of drafts. A failure to inquire, and, consequently, to learn the conditions, cast upon the bank the effect of knowledge of the conditions. It is not without significance that all the drafts which were prepared after the conversation and telegram of June 10th were written so as to be payable on "truck arrival."

The testimony on the part of the drawee will be found not to contradict, but to complement, the testimony offered by the bank which is pertinent to the course of dealings of the shipper and the commission merchant in relation to the acceptance and payment of the drafts. Thus the testimony given on the behalf of the drawee tends to prove that when the shipper's draft was presented the employees of the commission merchant would ascertain whether all or what part of the corresponding motor truck load had been sold. If all or any part of it remained unsold, they would fix the approximate market value of the produce unsold. If the proceeds of sale of the sold produce and the fair market value of the unsold produce, less the freight or transportation charges of the carriage by motor truck and the commissions of the merchant, were sufficient to meet the draft, the drawee would then accept and pay the draft. Unless either the net proceeds of sale or the net market value of the load unsold, or both combined, were enough to meet the draft, it would not be paid until they became sufficient. For these reasons the commission merchant would request the bank in Baltimore, which had received the draft for presentation and payment, to hold the draft until the drawee could thus find itself in a position to honor the draft.

On this testimony, the course of dealing had created the condition that the drawee be in sufficient funds or goods, separately or in combination, to meet the draft before it should be accepted and paid. So, when the telegram was sent promising to honor the shipper's "future drafts as in the past," the condition mentioned was by reference incorporated as a qualifying term of the promise.

The bank took title to all the drafts transferred to it after the delivery of the telegram with implied notice. In fact, there is testimony of express notice. On June 10th, a long-distance call was received by the commission merchant. It was answered by its salesman, and the caller represented himself to be the cashier of the bank in Georgia. The inquirer asked if the commission merchant would continue to pay the drafts in the future, and the salesman replied that it "would continue to pay the drafts in the future as they had in the past, *providing they had sufficient merchandise on hand at the time the drafts were presented to cover the drafts.*" The salesman was then requested to put this promise in writing. He then sent to the bank in the name of his employer the telegram found on the record. There is no contradiction of this testimony. This notice to the cashier, who, under the circumstances, was acting for his employer and within the scope of his particular employment at the time, is notice to the bank.

It will be observed that the telegram omits the clause italicised in the above quotation from the salesman's testimony. Its inclusion was not necessary, as the statement is merely the expression of one of the conditions enforced in the course of the dealings of the parties and so a detail embraced, according to testimony to that effect, wholly within the meaning of the summary phrase "as in the past" to which it is referable. Where the language of a contract comprehends the details of former particular acts and conduct which constitute the whole of a promise of future performance, the failure to enu-

merate such particular acts and conduct does not exclude them from the terms and performance of the contract.

Before determining the effect of the principles stated, and of the construction of the contract upon the rulings on the testimony and the prayers, a defense, which is interposed by the defendant and which goes to the right of action, should be decided. The defendant maintains that the telegram which was dispatched in its name was not sent by its authority. Whatever may have been the lack of authority of the agent who framed and forwarded the telegram, and of his power so to act for the drawee as to bind it to a promise in accordance with the terms of the telegram, the case could not have been withdrawn from the jury on that ground, as there is, in the testimony indicative of the agent's act being done in the ordinary course of his conduct and the later correspondence and acts on the part of the drawee, sufficient testimony from which it may be found that the drawee ratified and adopted the telegram as being binding as its corporate act. 1 *Mechem on Agency,* (2nd Ed.) sec. 268; and see *Griffith v. Turner,* 4 Gill 111; *Oelrichs v. Ford,* 21 Md. 489; *Lockhart v. State,* 145 Md. 602, 628, 125 A. 829; *Jones v. Sherwood Distilling Co.,* 150 Md. 24, 32 and 33, 132 A. 278.

The construction of the contract is not the domain of the witness nor of the jury, but of the court. In the present instance, the court is brought by the principles considered, in the exercise of this function, to the conclusion that the promise here is not absolute but qualified, and that the liability of the drawee to the bank on the promise made to accept and pay the draft is conditioned on the drawee having applicable, at the time of presentment, either sufficient net funds or valued net goods of the drawer to the amount of the draft.

See *Smith v. Abbott,* 2 Stra. 1152, 93 Eng. Reprint, 1095; *Mason v. Hunt,* 1 Doug. 297, 99 Eng. Reprint, 192; *Oliver's Excrs. v. Palmer,* 11 G. & J. 426, 430, 444; *Wintermute v. Post,* 24 N. J. L. 420; *Crane Co. v. Druid Realty Co.,* 137 Md. 324, 112 A. 621; *Gill v. Weller,* 52

Md. 8; *International Finance Corp. v. Calvert Drug Co.*, 144 Md. 303, 124 A. 891; *Brown v. Ambler*, 66 Md. 391, 7 A. 903; *Flora First Nat. Bank v. Clark*, 61 Md. 400, 407; *Scudder v. Union Nat. Bank*, 91 U. S. 406, 414, 23 L. Ed. 245; *Townsley v. Sumrall*, 2 Pet. 170, 176, 181-184, 7 L. Ed. 386; *United States v. Bank of the Metropolis*, 15 Pet. 377, 384, 10 L. Ed. 774; *Cline v. Miller*, 8 Md. 274; 10 *C. J. S., Bills & Notes*, sec. 175, pp. 665-662, sec. 182, p. 672; 1 *Ames, Cases on Bills & Notes*, pp. 152, 153; 4 *Williston on Contracts*, (Rev. Ed.) secs. 1195A, 1196; *Brannan's Neg. Instr. Law*, (6th Ed.) sec. 135, pp. 1084-1089, sec. 134, pp. 1080-1084; 2 *Halsbury's Laws of England*, (2nd Ed.) sec. 877, pp. 636, 637.

The effect of this construction of the contract on the rulings at bar will now be stated. The first question to be answered is what drafts were bought on the faith and credit of the drawee's agreement.

1. The promise to honor future drafts as in the past was made on June 10th. All drafts drawn before that date and discounted by the bank before that date were not embraced by the promise because they could not answer the specification of "future drafts," nor could they have been acquired by the bank on the faith and credit of a promise which had not been made at the time of their acquisition. The five drafts, aggregating $1450, which were dated and bought on June 6th, 8th, and 9th, are accordingly not within the terms of the promise. *Exchange Bank of St. Louis v. Rice*, 107 Mass. 37; *Pynetree Paper Co. v. Wilkinson County Bank*, 24 Ga. App. 260, 100 S. E. 753.

2. The remaining nine drafts which were all marked not to be protested and were dishonored fall into two groups. The first in time were dated on June 10th, 1938, and were sold to the bank on that day but after the telegram was received. They were four in number; and were payable at sight and were in the aggregate principal amount of $1100. The second group embraced five drafts which were made on June 11th, 1938, for $1500, and which were all bought by the bank on the same day.

These drafts were each drawn payable: "truck arrival." The nine drafts were promptly forwarded and were all in the hands of the correspondent bank in Baltimore not later than June 16th. The testimony on the part of the plaintiff tends to show that the shipper delivered to the drawee, from June 11th to 18th, twenty-one truck loads of produce, and had funds or goods in possession of the drawee wherewith to honor the drafts as promised. In conflict with the testimony is that of the defendant, which tends to prove that it had neither the funds nor the goods of the drawer to accept and pay the drafts when presented for payment. The resolution of this testimony is for the jury under proper instruction by the court. It was, therefore, no error to reject the defendant's prayer which instructed the jury to find a verdict for the defendant because there was no legally sufficient evidence to entitle the plaintiff to recover. The ruling on this prayer is presented by the fourth bill of exceptions, and instead of bringing up the action of the court on this and the other prayers in one bill of exception, there is a separate bill of exception for the ruling on every one of the prayers, so that the record is encumbered with eight bills of exceptions on the prayers instead of one, which is the sound and recognized practice. 2 *Poe, Pl. & Pr.* sec. 319 A; *Beck & Co. v. Hamline,* 122 Md. 68, 81, 89 A. 377; *McCosker v. Banks,* 84 Md. 292, 35 A. 935; *Washington, B. & A. Elec. R. Co. v. Faulkner,* 137 Md. 451, 467, 112 A. 820; *Hall v. Albertie,* 140 Md. 673, 676-677, 118 A. 189; *Brown v. Patterson,* 141 Md. 293, 297, 118 A. 653.

3. It is apparent that the granted and rejected prayers are not in accord with the rules of law nor responsive to the issues of fact which must govern the trial of this case, but there are some special objections which need statement.

The plaintiff submitted one prayer which the court granted as modified. The ruling is found in the fifth bill of exception. The prayer should have been rejected, as it is erroneously based upon a construction of the

drawee's promise which is in accord with the plaintiff's theory of absolute liability; and as it also permits a recovery for the drafts which were bought by the plaintiff before the telegram of June 10th, and, therefore, not in reliance on the promise of that telegram. The prayer, also, is open to the formal objection that it does not require the jury to find that the defendant refused to accept and pay the drafts mentioned in the declaration as dishonored.

4. The other errors assigned on the prayers are the rejection of the defendant's fourth, fifth, sixth, seventh, eight and ninth prayers. These rulings are brought up by the sixth to eleventh, inclusive, bills, of exceptions. These prayers were all rightly rejected. The fourth prayer was too general in its terms. It failed to afford adequate guidance to the jury in the inquiry whether the sender of the telegram was authorized and acted within the scope of his employment, while it ignored the testimony tending to show that the defendant had subsequently ratified and adopted the act of the agent. The defendant's fifth and 6A prayers are bad as they left to the jury the function of construction. It was for the court, and not for the jury, to determine if the offer of the promise of the telegram was too vague and indefinite to constitute a contract, when accepted by the bank.

It has before been stated that the plaintiff cannot recover of the defendant for any of the drafts which it bought before the plaintiff was advised of the defendant's promise. The test is not, as adopted by the defendant's seventh and eight prayers, the date of the "making" or the "issuing" of the draft after the sending of the telegram, but the purchase of the draft by the bank at a time when the bank neither knew nor relied upon the drawee's promise as stated in the telegram. The defendant's ninth prayer repeats the same error in a slightly variant form. The question is not, as adopted in this prayer, the date of "issue" or of "making" the draft but the knowledge of the bank, at the time it bought the draft, of the promise, and the bank's reliance upon the

promise in acquiring the title in good faith. The drafts dated June 10th were all made and offered for sale to the bank before the telephonic inquiry was made and the telegram received, but the bank did not buy when offered, and only after the promise by telegram was received. Nevertheless, under the ninth prayer there could be no recovery on the drafts dated June 10th.

The seventh, eight and ninth prayers have the further defect of submitting to the jury whether the telegram of June 10th, "constituted a valid binding contract," which is a problem not within the jury's province.

5. There are three exceptions reserved on the rulings of the court on the testimony. The testimony of the vice-president of the bank on cross-examination was that on June 1st, 1938, "Mr. Cox" owed the bank money. He was then asked to give the amount of this indebtedness, and, on objection, the court declined to let him answer. The second exception was taken after counsel for the drawee had sought, during this cross-examination, the opinion of the witness as to the significance of the telegram. The answer was that the bank construed the telegram "to mean that it was a promise to pay without any limitation at all." Then the same counsel inquired if this construction meant that, if the firm did not ship any goods, the drawee would pay a draft on it? The plaintiff objected and the court sustained the objection. The third exception was reserved during the testimony in chief of Joseph L. King, a witness for the defendant, who, after giving his employment as salesman for the commission merchant, and the nature and scope of his duties, stated, "The firm was not buying the goods from Cox; the goods were consigned by Cox to the firm, and the firm was only making commissions from the sale of the goods and the only way that the firm could lose money on the sale of the goods was if they extended credit to the wrong people and the goods should not be paid for." Then it was that the question was asked: "Mr. King, do your duties with the company include the extension of credit?" On the objection of the plaintiff, the court

would not permit the witness to answer. It is not clear what relevancy an answer would have, as the question apparently was directed to the authority of the witness to sell on credit the fruit and vegetables consigned to the commission house for sale. His answer in either the affirmative or negative would not have been material. The point at issue was the power of the witness to commit his employers to the acceptance and payment of drafts drawn by the consignor on his principal. If that is to be read into the question, there is no prejudicial error in the ruling, as, in his answer to the next question, he testified that he did not have the right to send the telegram. Thus there is no basis for a reversal on this exception. Nor is there any ground for complaint on the other two rulings. The debtor and creditor relation of Cox and the bank at the time of the shipments of the produce to the commission merchant was not involved in any issue. It was a wholly extraneous matter of no evidential importance, and the pursuit of such an inquiry would have been idle and confusing. The other inquiry sought of an executive officer of the plaintiff his construction of the operation of the contract in controversy upon a hypothesis of fact which did not exist on the record. This was plainly an objectionable interrogatory. *Bogart v. Willis,* 158 Md. 393, 405, 148 A. 585; *O'Ferrall v. DeLuxe Sign Co.,* 158 Md. 544, 554, 149 A. 290; *Stockham v. Stockham,* 32 Md. 196, 209; *Ringgold v. Ringgold,* 1 Har. & G. 11, 74; *Hutchins v. Dixon,* 11 Md. 29, 40.

For error in granting the plaintiff's first prayer, the judgment must be reversed and the cause remanded for a new trial in accordance with the views here expressed.

> *Judgment reversed, with costs to the appellant, and the cause remanded for a new trial.*